to set up. While you're setting up, one thing I got out of this case is don't drink the water. The water here is fine. Okay, Mr. Gerhardt, when you're ready. Thank you, Your Honor. May it please the Court. I'd like to make three points this morning. The first is that EPA's determination of the best available technology based on the use of surface impoundments is arbitrary and capricious because of EPA's repeated conclusions in the record that surface impoundments are the least effective technology that EPA considered. Second, for legacy wastewater, EPA's decision is arbitrary and capricious because EPA knew that existing power plants are using more effective technologies than surface impoundments to treat legacy wastewater. And third, for leachate, EPA's decision is arbitrary and capricious because it rests on an interpretation of the Clean Water Act that's been foreclosed by the Supreme Court and by precedent from the circuit. Turning to the first point, EPA set best available technology limits for both legacy wastewater and leachate based on the use of surface impoundments. Surface impoundment is a misleading phrase because it's a sophisticated phrase for a very primitive thing, a giant unlined hole in the ground. Felling pond. Yes. Yes, Your Honor. And the record is shot through with EPA's own conclusion that surface impoundments are not effective. Correct me if I'm wrong because this is a case with vast details and vast records. Isn't there evidence in the Federal Register that would have justified treating legacy wastewater differently from wastewater going forward because of some data with respect to the kinds of chemicals that may or may not be in legacy? In other words, maybe, is there anything that could show us that legacy wastewater is somehow different and deserves a different treatment than wastewater going forward because of chemical properties in them? I'm sure I've botched all that, but you'll correct it. Your Honor, let me answer that in two parts. So you're correct for some legacy wastewater. It is commingled, so different waste streams coming together. The problem is that just because it's different from other waste streams doesn't mean that how EPA handled it here is consistent with evidence in the record. The second part is there is some legacy wastewater that's exactly the same as non-legacy wastewater. So EPA found that for scrubber waste... Did they treat that the same? Did they not make an exception for that? Correct, Your Honor. Okay. Doesn't that show some sort of nuanced decision-making on the part of EPA? Well, no. In fact, it's just the opposite because EPA is saying, we have this waste stream here, scrubber wastewater, that we know some plants store separately. They don't commingle it, and yet we're going to act as if it's different even though it's the same. And EPA even conceded in the Federal Register that it could be treated with the same technologies that EPA is requiring for non-legacy wastewater. So you have the same wastewater being treated differently for no rational reason. Are you not making... Maybe you are making the argument, so correct me if I'm wrong. Are you making the argument that the statute doesn't allow the treatment of sort of legacy versus non-legacy? Are you making that argument that that's not permissible for the EPA to do under the statute because of the time element? We're going to treat some over here differently and some going forward differently. Your Honor, our position is that when the timing of when the wastewater is generated has no relationship to any of the factors listed in the statute that EPA is to consider, that there's no basis for EPA to treat waste streams differently based on simply when they're generated. Okay. That's correct. So, I mean, any rule is going to have an effective date, right? So you concede that, that a rule can have an effective date and sort of going forward we're going to do this, but before we're not going to. How is it any different than what's happening here? Correct, Your Honor. So the unusual and, as far as I know, the unprecedented thing here, if EPA had simply said we're going to set an effective date and discharges before that date are treated differently, that may very well have been permissible. The unusual thing about what EPA did here is they said that wastewater generated before the effective date gets treated differently. So the effective date passes, the facilities installed new pollution controls, and then you have a pond sitting here with wastewater that was generated, say, 10 years ago. Under EPA's interpretation, that wastewater now doesn't have to be treated with the technology that the power plant has installed. And so that's what's unlawful here. Thank you. So turning to my second point, for legacy wastewater, EPA's primary defense for treating these waste streams differently is that it lacked the data for commingled waste streams. And there are two problems with that rationale. So the first is that this lack of data is a problem of EPA's own making. EPA last set these limits in 1982. It had 33 years to gather the data that it needed. And EPA has a statutory responsibility to set these limits. So if you allow EPA to get off by saying it doesn't have the data, you're essentially eviscerating the statutory command. Your point is when you have to do best efforts, you don't satisfy that when you don't undertake any effort. Correct, Your Honor. What would you say, just hypothetically, if they were to argue that it was literally impossible? Your Honor, if it were literally impossible, I think that that would be a valid defense. But EPA would still then have to consider other options for dealing with the data gap. And so EPA had options other than what it did here that it failed to consider. I take your point here is this was clearly not impossible. Yes, there's nowhere in the record where EPA ever says it was impossible to gather the data we needed. We're not going to hear that from them today. They may say it, but there's no place in the record where I've read that. EPA hasn't challenged y'all's standing, but obviously it's not something you can waive. So I just want to be sure I understand the members of your entity that wrote affidavits and so forth, how are they any different than just the general public? What is the specific harm to them? Your Honor, the three member organizations that I represent have members that use these waterways in ways that the general public doesn't. So there are many members who live downstream of these power plants that discharge toxic water pollutants. Some of them get their drinking water from those waterways. Others of them fish and recreate on those waterways. So they use them in very concrete and specific ways that the general public doesn't. Okay. Can you talk to us a little bit about the forfeiture issue? It seems like you count yourself lucky that you're in this circuit, but tell me why our circuit's rule is correct and we shouldn't go with the other circuit's rules in terms of the notice and comment, not having objected. With respect to the legacy wastewater issue, Your Honor, that's what you're asking about. So we didn't, in our comments, raise the no action option, but it's a bit disingenuous for EPA to say it wasn't on notice of this option because you're simply talking about the doing nothing option. We're not talking about some sophisticated plan that we're raising for the first time here in court. It's the option of literally doing nothing because if EPA doesn't set nationwide limits, the default is that state permit writers set them on a consideration. So you're arguing that there's no forfeiture problem even if we were in a different circuit? Yes. Just to be clear, that I understand Judge Ho's comments, are we talking about the option of doing a case, sort of a local regulation? Yes. Now, in your comment, I mean, I've looked at your comment, you have a bold, you have a, I think your comment, it's submitted on behalf of a number of groups, but it says EPA must reject options that allow BAT for FGD wastewater to be determined case by case. And the comment, I believe this is a comment cited in the EPA's brief, and it goes on to say it would be disastrous for water quality, wildlife, and public health based on the state's failing record at making BAT determinations. Why doesn't that go beyond a forfeiture and sort of you're actively arguing against the standard that you now want us to adopt? It's certainly our preference that EPA set nationwide limits where it has the data. The issue here is that EPA is claiming it doesn't have the data to set limits on a nationwide basis. And so, in that circumstance, it's preferable for it to be left up to states. Because what EPA did is EPA precluded state permit writers from requiring any more stringent limits than the least effective technology. So in that circumstance, it's certainly our position that it's better to leave it up to state permit writers. It's just a question of does EPA have the data or not to set nationwide limits. In my remaining time, I'd like to turn to LEACH-8. So for LEACH-8, EPA did the same thing as it did for legacy wastewater. It set limits based on the use of the least effective technology, surface impoundments. And here, EPA's sole defense is that it made reasonable further progress for other waste streams and therefore it's permissible not to more stringently regulate LEACH-8. And there are two problems here. One is a legal problem. The second is a factual and record-based problem. The legal problem is that EPA's interpretation simply can't be squared with the Supreme Court's National Crushstone and this circuit's precedent in Texas Oil and Gas Association. So National Crushstone, the Supreme Court said that best available technology is a commitment of the maximum resources economically possible. Well, that's a far cry from EPA's interpretation here that all you have to do is make a good enough effort, a reasonable amount of progress. Secondly, in Texas Oil and Gas Association, this circuit held that best available technology limits must be technology-based, not harm-based. And what the court meant by that is that you look at what technologies are capable of achieving, not at the harm to receiving water bodies. And that's exactly the opposite of what EPA did here. EPA looked at the relative size of LEACH-8 and the relative concentration of pollution in it. And that's nothing other than looking at the harm to water bodies. So you can't square EPA's interpretation here with subtle precedent. Secondly, even if you didn't agree with us on that legal issue and thought that EPA could do that, the way that EPA considered the size of LEACH-8 is inconsistent with EPA's own statements. So EPA in its response brief cites this 2015 Effluent Limitations Guidelines review that says the top 18 industries are EPA's top priorities for effluent limits. Power plant LEACH-8 is the 18th largest waste stream in the entire country. So you have EPA in one document saying this is a top priority for effluent limits, and then you have them here in this rule saying, well, it's too small to merit meaningful regulation. And you simply can't square those two statements with each other. Moreover, if you look at that same document, you'll notice that EPA has set effluent limits for over 50 different industries. I take it EPA's point in terms of the 18th rank is that they're focused on the first 17 or the higher priorities, and they'll get to LEACH-8. Well, the problem with that, Your Honor, is that EPA has, in fact, gotten to many industries, whole industries that have discharges that are smaller in volume than power plant LEACH-8. So in fact, for most of the effluent limits that EPA has set, the industry's discharges are far smaller than power plant LEACH-8. You're talking about in other contexts, they've gone after LEACH-8, but, sorry. No, Your Honor. What I meant was that in other effluent limitations guidelines rules, EPA has tackled other industries, say coal mining or paper mills, things like that. And those entire industries have pollutant loadings that are smaller than just the LEACH-8 from power plants. So you said they're already down the list. They're past 18th is what you're trying to say. Exactly, Your Honor. They've already tackled industries that are far smaller than they've rejected here. So they clearly had the time, and so they should have done it, is your argument. Yes, Your Honor. Okay. If the Court has no further questions, I'll thank you for that. Okay. You've reserved time for rebuttal. Thank you. Mr. McDermott. Good morning, Your Honors. Good morning. It's a bit of a shotgun approach that NRDC has taken here, and I'm going to try and get to as many points I think that they were making. With respect to legacy wastewater, Your Honor asked whether it would be impossible to more strictly regulate impounded waters. And I don't know that EPA ever used that word in the record, that it would be impossible. But basically what EPA said was, we have a disconnect here with the environmental petitioners. And I think their idea is that impounded wastewaters may be susceptible to some form of treatment, and that that's all they need to show to prevail. And I think they actually submitted a comment, you know, that sort of goes to that effect. And as they said, taken together, the record suggests that systems may be technologically and economically achievable for treating legacy ash waste, even when commingled. But they didn't explain how that would be done. And I think EPA documented very thoroughly in the record the difficulties that are inherent in trying to treat impounded wastewater. It's exceedingly variable. It's, you know, it's essentially mutating right before your eyes. And EPA found that there was no technology that they were aware of that would ameliorate that problem. And so there's an utter lack of data to do that. And EPA isn't allowed to write a BAT that says something like, well, use your, you know, take a shot at it, try some various technologies and try and reduce the level of pollutants. That's not what a BAT is. You mentioned lack of data. Why is there lack of data? Well, it's, that's a difficult question. I mean, I think it's, you know, EPA was, their investigation was very thorough. I mean, it went on for years and years. And they weren't able to come up with any data that would characterize accurately the. Are you claiming that it's scientifically impossible to collect such data? Or are you saying, look, you have other priorities, resources are limited, and you'll get to it eventually? I think some of the latter. But I think that EPA was focused here on the forward-looking elements of the steam electric power industry. So they focused on the, you know, going forward, here are the main waste streams that we're looking at. And for three of those five waste streams, they ratcheted down the requirements to zero discharge. And so I think the bulk of their effort was probably fairly said, devoted to those future-looking waste streams. And trying to figure out how to ratchet those down as far as they could. And they accomplished that end. Let me, if I may, just articulate where my concerns are to see if you can satisfy them. Without question, this statute provides the EPA with a lot of discretion. You're supposed to undertake best control, best control measures and practices. But you're allowed to choose any number of factors, including any factors that you guys come up with and deem appropriate. So I get all of that. But it does require you to undertake best efforts. And so the concern I have is, you do have to do something. And if you're telling me you simply haven't done something, that's where I start to have a concern. That's why I'm asking about the impossibility. Yes, no, they did something. I mean, basically, they came up with, they reaffirmed that for the present period, the treatment technology that they were able to justify on a uniform and national basis is the use of surface impoundments. Now, surface impoundments are efficacious. They're not very good at removing dissolved metals from wastewater. But they do remove particulates. So the EPA arrived at a treatment technology, surface impoundments. It didn't wash its hands of the problem. It said that for present purposes, this is the best that we can do. And so I think there is a BAT in place. I think you have to understand that. The environmental petitioners don't think it's, they don't think it's the best out there. But you can see from their comment, they said there's some other things you could throw at this problem. We can't tell you- There's something available that's even better. Your response is that we don't have the data to decide whether or not that is better. Yes, on a uniform basis. You know, these BATs- I think they're also suggesting site by site, aren't they? I'm sorry, suggesting? You said a uniform. Pardon me, as Judge Duncan said, this is complicated. Yes. But you mentioned uniform. Aren't they also proposing a non-uniform sort of site by site? Or am I mixing things up? Case by case. Yeah. Oh, ultimately, there's case by case is used for, as sort of a last resort for pollutants. It's not the preferred methodology to do it. But some sites can be handled that way. But the primary impetus is to establish a BAT. And that's what they did here. They utilized surface impoundments for just two of the waste streams. For most of the waste streams, there is a very aggressive treatment technology, such as to reduce the pollutant levels to zero. So I think that one has to keep, I think, in the forefront that the environmental petitioners are not claiming that the rule writ large didn't make reasonable further progress. I don't think they could deny that, given what happened with all these other waste streams. They're picking out- I don't want to call it nitpicking, but it's something like that. They picked on several waste streams, legacy waste water, which is probably the most problematic to try to get your arms around, and then leachate. Which, to adjust some of the points that were being talked about earlier with respect to the size of leachate, EPA has the discretion, in our opinion, to treat the size of a waste stream, the relative size of a waste stream, as one of the factors that EPA has ample discretion to take into account. I'm like, what is it relative to, though? Relative to how much other pollution this industry is committing, or relative to the world? And they're saying, relative to the world, it's 18th. And there's a lot of total industries that sound kind of like polluters, who all together pollute less than the leachate. So, how can you justify a it's good enough for government work kind of argument on the leachate? Well, I mean, you're correct. It is one of these, you know, eye of the beholder questions. You know, you can prove almost anything with statistics, obviously. But what EPA looked at was this statistic, that leachate comprises 3% of the total volume of steam electric power plant discharges. Just 3%. So, in EPA's, from EPA's perspective, that's a small question. Now, I understand that they can make an argument that, well, you start comparing it to other completely unrelated wastes, waste streams that you can. They're unrelated, but it's the same environment, right? It's the same environment, but it would be. So, I mean, the industries are unrelated, but the overall concept here is reducing pollution, eliminating it ultimately, but at least reducing it for the time being. So, why shouldn't we be looking at the overall, everything that's going in this particular river? Why isn't that part of the analysis? Or a series of linked rivers or, you know, whatever. Why isn't the fact that this is, it's kind of like when you say something's only 3%, well, 3% of what? If it's 3% of a dollar, that's not very much. 3% of a million dollars would sound like a lot to anybody, right? So, they're saying the what is the problem. The 3% of what, the what is so big that the 3% is big. And therefore, you can't just say, ah, forget about it. And I'm not really understanding what's wrong with that, with their argument on that. Well, EPA didn't say forget about it. It said that we're going to treat this waste stream with surface impoundments. That's the best, that's the best available technology that they arrived on. So, they did arrive at a treatment technology. It's not good enough for environmental petitioners, but they did arrive at that. But the technology they're arguing for, is it available and economically possible? It's, for leachate, it is available. Chemical precipitation, is that what they're arguing for? I'm sorry, what? Are they arguing for chemical precipitation? I believe that's, I believe that's right, yes. I would say it is, it is available. But I, what about the, is the economics just so crazy that it's just not feasible? It's costly, but EPA did not do a cost-benefit analysis here. Cost is one of the factors EPA took into account. So, but I think probably the, probably the fairest way to look at it is that EPA was looking at this rule holistically. And they were saying, okay, let's focus on the biggest bang for the buck. And we'll go after that. But you just said they didn't really look at the buck. So if we have a technology that's available, and we don't really know the cost-benefit, then how can we say we shouldn't do it? I can't, it's possible to do, and I don't really know what it costs, so I'm just going to not do it. That, that I'm having trouble with that. Well, they did impose a treatment standard, but I think that when I say holistically, what I'm talking about is, they looked at the steam electric power plant industry. And there they went for the fruit that would be most efficacious. These are the biggest waste streams. These are the ones we want to apply most of our efforts to. And what they said with respect to leachate, it's relatively small, it's 3%. And we believe we've made reasonable further progress, which is the other critical element of the BAT analysis in this rule. And reasonable further progress is, you know, to basically get to zero waste production from three of the main waste streams. And so looking at it that way, leachate is a relatively minor part of the picture. It's not, I think one other thing to bear in mind is that the, is that something like the decision on leachate is not carved in stone. EPA re-examines the LGs from time to time, and it's, and they can be, you know, it probably will be revised. Exactly when, I can't say, but, you know, these are- Well, you know, there's a lot, I mean, there's a lot of reasons for that sort of thing. But, you know, I think that it's, you know, it's easy for them to sort of say, you know, why didn't you do it yesterday? But these ELGs, as you can, I think as the court has a sense, they are exceedingly complicated. I mean, you have to imagine this. EPA went to, you know, all over, they went to Italy, they went, you know, they went to hundreds of plants. You know, they sent out questionnaires to 700, and received responses from 733 different factories. And they went to all these places, and they tried to examine, how are you guys treating this stuff? What are you producing? What are the technologies out there? It's an exceedingly difficult thing to do. And- What is difficult? Trying to arrive at a best available technology. Because ultimately, that's a very important concept. Because when they arrive at that, EPA, what they do is they arrive at, this is the technology that we found can reduce these pollutants to a satisfactory level. And then, EPA sets the level, and then anyone can use other technologies. They don't have to use that one that EPA picked. I mean, we've already established that the technology is there. I can understand if the technology wasn't there, I don't know that we would be here. So, the technology is there. I'm just still a little bit struggling with why it wouldn't be used. Because you haven't established that it's just so cost prohibitive that it would just put the whole industry out of business or something like that. So, I don't see why that's so complicated. I mean, I understand the overall case. A lot of science here. I'm not claiming I'm knowledgeable on the science. I'm simply saying the science exists. The technology exists. I do understand that. And you've said that. Why isn't that enough? What piece there is still missing on the leachate? I understand on the legacy water, but- EPA has a tremendous amount of discretion, and its decision-making has to accord with minimal standards of rationality. Can we talk about the discretion for a moment? Yes. I want to make sure we're isolating, as a matter of statutory text, what you have discretion on and what you don't have discretion on. As I read the statute, and I invite you to tell me if I'm wrong, the statute says EPA has to do the best.  You can't choose the bronze. The discretion you have is in determining what is gold and what is bronze. And it looks very broad as to how you define, you know, just because it's the best scientifically doesn't mean you have to do it, because it may be too expensive, it may not be worthwhile, the bang may not be worth a buck, et cetera, et cetera. But you have to tell a story as to how you think this is gold, they think this is gold, but in that world, you get deference. The problem I have is that's not what I'm hearing from you. What I'm hearing from you is bronze is good enough. Does that make sense? I think it, I have very little disagreement with most of what you said, but I don't know that we would agree that bronze is good enough. I think it's more that in taking into account all of the factors that we have discretion to take into account, we arrived at, for present purposes, surface impoundments are the best overall, in terms of the entire structure of what we're trying to do here. And what we're trying to do here is not simply look at leachate in isolation. We're looking at leachate as a part of a much broader structure. Let's go back to the earlier discussion, though. Have you determined that it's the best, or have you determined that you don't have the data to know whether some alternative is the best? Well, for purposes, for leachate purposes, I think... I'm sorry, I'm at a legacy. It is confusing, because they both start with a lea. You were about to say you do have data for leachate. What's that? Were you about to say you do have the data for the leachate? I think that's correct, yes. But I think that there... You were going to talk about legacy wastewater now. Oh. Or were you? I'm sorry. No, no, I wasn't. But, I mean, we can. But I don't know that I can illuminate much more on it. I think EPA just has a tremendous amount of discretion to make decisions here. And if one of the elements on the decision tree is that we're going to stay with surface impoundments for a minor waste stream, relatively minor, given the 97% are accounted for, that's our decision, and that's not irrational. You know, I mean, there are all kinds of small waste streams that are part of these plants, which are incredibly complex operations. So it's your point that, yes, you acknowledge that something would be better, but you are allowed to do this bronze level? It would be better at pollutant removal. But I think that it would be better at pollutant removal. What would be better? I'm sorry. Applying the chemical precipitation for leachate would be better for pollutant removal. But EPA's position is, and I think it's been embraced not only by the Sixth Circuit in the BP case, but the Sixth Circuit sitting on Bonk in the Citizens Coal case, that the BAT analysis does not have to focus exclusively on what is the best pollutant removal technology. Best is an amorphous concept that is inherently laden with discretion. And EPA's idea here is that you have the deference as to whether something is gold, silver, or bronze. But I heard you conceding that this is bronze, you just have the discretion to choose bronze. I think it could even extend to if it's the gold standard for pollutant removal, that in and of itself doesn't dictate, okay, therefore it's BAT. BAT is much more nuanced than that. It has multiple factors and multiple considerations, including EPA's just ability to focus its efforts and the efforts of the regulated community on the more high-end district. Back when I was a trial judge, this argument would have lasted all day. But we can't do that now. So thank you. Your red light is up. Oh, yes it is. Thank you. And we're going to, I think Mr. Johnson may have something to say about cost. I'm just guessing. Thank you, Niles. I appreciate your time. May it please the Court, Harry M. Johnson on behalf of the Utility Water Act Group, an intervener in this case. And so it's clear we represent most of the industry here. And I have to say, in response to some of the questions, I would disagree slightly with EPA's position here. With respect to whether there is evidence or data to suggest that chemical precipitation is technologically available for treating leachate, we agree that theoretically, theoretically the record shows that there is a process called chemical precipitation that can work, that could work. However, and this is where we might disagree or at least how it came across we may disagree, there is no plant anywhere that uses chemical precipitation to treat leachate. And that's in the record at Joint Appendix 13. If the EPA never makes them do it, they never will. So then that's kind of circular, isn't it? We don't know if it works because we ain't going to use it. Well, and there's no requirement that when an agency attacks a problem, that it attacks all aspects of the problem at once. The case law is very clear that the agency can act incrementally. And in fact, that's the way the EFLA limitation guideline statute is set up. It's set up in stages so that eventually we will eliminate all discharges. But we can't do that all at once. It seems like there's a difference between 30 years and all at once. So I'm a little struggling with this notion that, well, we're doing it, we're plugging away, when it seems like it's been a bit stagnant. Well, with respect to this industry, it has been a long time since EPA revised the effluent limitations guidelines. But let's remember, and I think counsel for EPA, Mr. McDermott, pointed this out, they were attacking a large problem here. And the five waste streams that are not at issue here are the most significant waste streams. Think about what we're talking about here in this case. We're not talking about fly ash transport water, bottom ash transport water, flue gas mercury transport water. What we're talking about is leachate and legacy waste water. And as Mr. McDermott pointed out, there are zero discharge limitations that will come into effect for those major waste streams. What does that mean? Well, if we think about it, what that means is over time leachate is not going to be as much of a problem, because there's less going to landfills, there is less going to impoundments. The same holds true... But then that also seems to answer the cost issue. If you don't have it, it ain't going to cost you anything to treat it. But if you have it, why wouldn't you use the best technology on it? Well... Do you have information on this being just so cost prohibitive it puts your people out of business? I don't have... I will go to what EPA said in the record on this case with respect to cost. In the record on page 6... I'm sorry, 768 and 769, in response to the Utility Water Act group's comments that these were significant costs being imposed on industry, EPA talked about and recognized this circuit's very clear law that you should use... You cannot require the agency to do a cost-benefit analysis. However, at some point, if the costs are so wildly out of proportion to de minimis benefits, then there's a different story. Then you can consider the relative cost and the de minimis benefits. And so what EPA said in footnote 25 was that EPA notes that it did make certain decisions on the final steam electric ELGs that have the effect of avoiding the imposition of significant incremental costs in exchange for de minimis incremental loadings reductions. All right? Significant costs, de minimis reductions. For example, EPA ultimately chose not to establish more stringent BAT limitations than exist under previously established BPT regulations governing the discharge of pollutants and combustion residual leachate from existing sources. That would have increased the cost of the rule by approximately 56 million annually. Frankly, we believe that's wildly underestimated, but this is what EPA found, while yielding only an estimated 3% reduction in total pollutant loadings. So EPA made a finding here that the benefits of even going down the path of determining whether you could actually use chemical precipitation to treat leachate would lead to de minimis benefits and significant costs for industry. And so our argument ‑‑ De minimis because only 3%, that last part that you read. That's defining what de minimis means. Yes. De minimis from this industry. 3% of the industry. Yes. And I would also like to clarify, there was discussion ‑‑ 18th of the world, if you will. Polluting world. I would defer to EPA on its conclusions there. I see that my time has expired. Everybody good? Okay. Thank you, counsel. We appreciate you. And Mr. Gerhardt, wrap it up for us. Thank you, Your Honor. So let me pick up with the last bit about costs. So it's simply not true that that was a rationale the EPA relied on in the record. If you look at the preamble to the Federal Register that talks about leachate, EPA doesn't mention cost at all. It doesn't mention de minimis benefits at all. That's not in EPA's brief. So that's simply not the reason the EPA relied on in the rulemaking. They disavowed cost here today. Excuse me? They disavowed cost today as well. Yes. Yes. They, the rationale they provided in the record was based on reasonable further progress. It wasn't rooted in cost. But if we sent it back for the EPA to reexamine in light of our brilliant opinion, would they then be in a position to look at the issue that the interviewer raised on the cost? Absolutely. Cost is required under the statute for them to look at. Okay. However... So we could, you could win the battle and lose the war here. Yes, Your Honor. But I don't believe we should lose the war because as we've mentioned, it's not de minimis. It's the 18th largest industry in the country. So to call it de minimis is contrary to everything EPA's done. It's like my 3% of $1 million is different from 3% of $1. Yes, Your Honor. I'd also like to address a lot of questioning that Judge Ho had about whether EPA must select gold or bronze. So EPA did in fact find that impoundments are bronze. And I think calling impoundments bronze is charitable. I'd say it's sort of giving someone a sticker rather than a medal. Impoundments simply can't remove dissolved pollutants that are in this wastewater. And that's not my conclusion. It's EPA's own conclusion. So as I said at the outset, to call impoundments a technology really is charitable here. We're really talking about nothing more than a pond, a hole in the ground in which the wastewater sits. This isn't an advanced technology that the industry is capable of. What about this notion of incremental treatment that, you know, we're just life is busy and we're just doing the best we can with what we've got and they'll get to it when they get to it? How does that play? Your Honor, the Clean Water Act amendments that are issued here were passed in 72. The goal was to eliminate all water pollution by 1985. Where in 2018, this is the first time EPA has set best available technology limits on toxic wastewater pollution from the largest industrial source in the country. It took them 33 years to get there. And they only got there because we sued them. So this notion that they're going to get to this sometime soon is simply... Soon is a relative concept too. Like 3% soon might be. 3% of soon. 3% of the history of the world, they did that. I'd also like to address a question that you had, Judge, about the technology for treating leachate, whether it's available. And EPA expressly found in the record, this is index 10082 at 7-20 and 7-24, that chemical precipitation is an available technology for treating power plant leachate. So there's no dispute here as to whether, at least as far as EPA is concerned, that chemical precipitation is available. Physically, what happens if we remand in whole or part? Kind of just walk me through the procedure then. Your Honor, EPA would have to reconsider these particular waste stream best available technology limits. We're asking for those limits to be vacated in the interim because that would allow state permit writers to set best available technology limits on this case. You're saying no regulation would be better than the regulations they have because the states would be rougher on these industries? Well, Your Honor, that's exactly right. Because what they did is they locked in the worst technology nationwide such that... And then that overcomes the state requirements. Yes. Wow. Okay. And the final thing I'd like to address is that, Judge Ho, you asked about EPA's duty to make best efforts here. I'd like to point out that for legacy wastewater, EPA only proposed one option, the option they finalized. So they never even seriously considered any other option, including the do nothing option in which states would be able to make these decisions on a case-by-case basis. So to call what they did best efforts here, they essentially made no effort. They said, this is what we're going to do. And they never considered any other option for dealing with legacy wastewater. Okay. Thank you. We appreciate it. Thank you, Your Honor. ...arguments, and we're going to take a...